UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

VICKI MARTINEZ FOWLER,

    *Plaintiff*,　　　　　　　　　　CASE NO. 11-CV-15161

v.　　　　　　　　　　　　　　MAGISTRATE JUDGE CHARLES E. BINDER

COMMISSIONER OF
SOCIAL SECURITY,

    *Defendant*.
_____/

### OPINION AND ORDER[1]

**I.   INTRODUCTION**

This is an action for judicial review of Defendant's decision denying Plaintiff's claim for a period of disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI") benefits. The case is before this magistrate judge for opinion and order pursuant to the parties' consent under 28 U.S.C. § 636(c) and the district judge's order of reference. (Doc. 16.) Pursuant to E.D. Mich. LR 7.1(e)(2), the parties' cross-motions for summary judgment (Docs. 11, 15) will be decided without oral argument.

**II.   ANALYSIS**

    **A.   Background**

Plaintiff was 44 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 9 at 37.) Plaintiff's employment history includes work as a teen daycare worker

---

[1] The format and style of this Opinion and Order are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002); Fed. R. Civ. P. 5.2(c)(2)(B); E.D. Mich. Admin. Order 07-AO-030; and guidance promulgated by the Administrative Office of the United States Courts, which can be found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This opinion only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

for six years, a sales clerk for one month, and a data processing clerk for seven years. (Tr. at 155.) Plaintiff filed the instant claims on March 26, 2009, alleging that she became unable to work on November 10, 2008. (Tr. at 129, 134.) The claims were denied at the initial administrative stages. (Tr. at 63, 64.) In denying Plaintiff's claims, the Commissioner considered disorders of back (discogenic and degenerative), osteoarthritis, and allied disorders as possible bases for disability. (*Id.*) On April 12, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") John J. Rabaut, who considered the application for benefits *de novo*. (Tr. at 14-28, 33-58.) In a decision dated April 27, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 28.) Plaintiff requested a review of this unfavorable decision on May 12, 2011. (Tr. at 8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on November 8, 2011, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-7.) On November 22, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

    **B.**    **Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely

3

because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

**C.  Governing Law**

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*,

4

74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through September 30, 2010, and that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 10, 2008. (Tr. at 19.) At step two, the ALJ found that Plaintiff's osteoarthritis, degenerative disk disease of the cervical spine post C5-6 fusion, shoulder tendinitis, degenerative disk disease of the lumbar spine, adjustment disorder, and headaches were "severe" within the meaning of the second sequential step. (Tr. at 20.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr.

at 20-22.) At step four, the ALJ found that Plaintiff could not perform any of her past relevant work. (Tr. at 26.) The ALJ also found that on the alleged disability onset date, Plaintiff was a younger individual, age 18 to 49. (*Id.*) At step five, the ALJ found that Plaintiff could perform a limited range of light work. (Tr. at 22-26.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 27-28.)

**E.     Administrative Record**

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was treated for neck, shoulder, and back pain by Ira Sabbaugh, D.O., from January 2005 through March 2007. (Tr. at 198-265.) On September 14, 2005, Plaintiff underwent an anterior cervical fusion at C5-C6 with allograft bone and cervical plating, which was performed by P. Grain, M.D. (Tr. at 266-68.) Upon discharge, Plaintiff's "preoperative symptoms were resolved and she was discharged home in excellent condition[.]" (Tr. at 268.) By September 23, 2005, Plaintiff was "doing extremely well" and was "symptom-free." (Tr. at 255.)

On November 8, 2005, an MRI of Plaintiff's shoulder showed "findings suggestive of tendinosis at the insertion of the supraspinatus tendon." (Tr. at 235.) Plaintiff participated in physical therapy in 2005 and 2006. (Tr. at 288-307.) Upon discharge in August 2006, it was noted that Plaintiff's condition was "improved" in range of motion, flexibility, strength, function and pain management. (Tr. at 288.)

On August 8, 2006, an MRI of the cervical spine revealed that "there has been prior surgery at the C5-C6 level with anterior plate and screws present" and that the "disc protrusion which was seen at this level previously is no longer present." (Tr. at 234.) There were "minimal stable discogenic bulges" seen at the C3-C4 level, but "[n]o signal abnormality" was "seen within the

7

cervical or upper thoracic cord," the "[c]raniocervical junction appear[ed] normal [and] [a]pical regions appear[ed] normal on the coronal series." (*Id.*)

On October 11, 2006, due to "[s]yncope with fall," Plaintiff underwent an echocardiogram that was "normal[.]" (Tr. at 231.) On October 30, 2006, Plaintiff was examined by Douglas C. Kubek, D.O., for her "[i]mbalance." (Tr. at 320-22.) Dr. Kubek noted that the etiology of Plaintiff's imbalance and lightheadedness was "to be determined" and indicated that further study would need to be done regarding her headaches to "rule out migraines." (Tr. at 321-22.) A few days later, on November 2, 2006, Dr. Grain wrote a note indicating that Plaintiff "may return to work with full duties 1-1-07, 8 hours per day." (Tr. at 323.)

In January 2007, a two-page report of Plaintiff's prescribed medications was attached to a "Multiple Prescriber Alert" and sent to Plaintiff's physicians, alerting them that there were "multiple prescribers of 1 or more opiates for 30 or more days." (Tr. at 308-310.)

On March 8, 2007, Gavin Awerbuch, M.D., performed EMG/NCV studies and diagnosed "[r]ight C7 radiculopathy" and "[l]eft mild carpal tunnel syndrome." (Tr. at 244.) Dr. Awerbuch recommended "conservative care including carpal tunnel braces, anti-inflammatory agents and occupational therapy." (*Id.*)

On April 3, 2007, Dr. Grain wrote a note indicating that Plaintiff "may only return to work at 4-6 [hours] per day as per my restrictions from previous." (Tr. at 315.) Dr. Grain had imposed the same restrictions on December 29, 2006. (Tr. at 318.) On April 17, 2007, an MRI of the cervical spine showed "stable findings as compared with the prior MRI study with C3/C4 and C5/C6 discogenic bulges." (Tr. at 273.)

One month later, on May 15, 2007, a study of Plaintiff's cervical spine showed "some osteophytes" and "some degeneration" at disc C4-C5. (Tr. at 330.) Plaintiff was examined by Peter

8

L. Bono, D.O., who noted "previous anterior cervical decompression and fusion at C56, performed by Dr. Peter Grain," a "[c]entral disc herniation at C67," and "[d]egenerative disc disease at C45 and C34." (Tr. at 241, 328.) Dr. Bono noted that it was "difficult to ascertain whether the neck and arm pain [was] coming from C45 or C67." (Tr. at 241-42.) He did not think there was "any indication at this time to take this patient through such an extensive surgery," so he "recommended she continue nonoperative management" and also prescribed a soft collar. (Tr. at 328-29.) Dr. Bono noted that Plaintiff's motor strength for her deltoids, biceps, triceps, wrist extensors, wrist flexors, interossel and grip was five out of five and normal on the right and the left. (Tr. at 240, 327.) In addition, Plaintiff's sensory indications were all normal on her right and left from C5 through T1. (*Id.*) Plaintiff's hip, knee and ankle flexors and entensors all showed full strength (five out of five) on the right and left and her sensory indications were all normal on the right and left from L2 through S1. (Tr. at 241, 328.) Finally, Dr. Bono found no nerve entrapment syndromes on the right or left. (Tr. at 240, 327.)

On February 4, 2009, Plaintiff was examined by Frank Brettschneider, D.O., who diagnosed "[a]llergic rhinitis." (Tr. at 358.) On March 12, 2009, Plaintiff was referred by Dr. Sabbaugh for a Biopsychosocial Assessment. (Tr. at 363-78.)

In April 2009, Plaintiff was referred for individual therapy sessions. (Tr. at 379.) On April 27, 2009, Plaintiff was again sent to physical therapy to reduce pain and increase mobility of her cervical spine. (Tr. at 385-413.) By June 15, 2009, Plaintiff's "functional status ha[d] improved" and she had "made good gains in her ROM [range of motion] and [was] progressing her strength." (Tr. at 412-13.) On April 29, 2009, nuclear medicine bone imaging showed "[i]ncreased uptake in the lower cervical spine, most intensely at L4 and L5 diffusely." (Tr. at 422.)

A Physical Residual Functional Capacity ("RFC") Assessment was completed on September 9, 2009, by Sally Kline. (Tr. at 414-21.) The assessment found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday if allowed to alternate sitting and standing to relieve discomfort, and that Plaintiff was limited to occasional use in her upper extremities for pushing and pulling. (Tr. at 415.) Plaintiff was found to be occasionally limited in all postural areas except that she should never climb ropes, ladders or scaffolds. (Tr. at 416.) Plaintiff was found to be limited to only occasional overhead reaching, but was otherwise unlimited in the manipulative areas. (Tr. at 417.) There were no visual or communicative limitations established (Tr. at 417-18), and the only environmental limitation was that Plaintiff should avoid concentrated exposure to hazards. (Tr. at 418.) The assessment distinguished the medical source statements on file by Dr. Grain (indicating that Plaintiff could return to work full-time on January 1, 2007) and his statement on April 3, 2007, that Plaintiff could only work four to six hours per day, because they were made prior to the alleged onset date. (Tr. at 420.) The assessor noted that the January 2007 statement was consistent with the medical evidence in the file. (*Id.*) The assessment concluded that Plaintiff was "not fully credible." (Tr. at 421.)

In her daily activity report, Plaintiff stated that she is able to take care of her dog and cat and that she enjoys sewing and watching television until she goes to bed. (Tr. at 171.) Plaintiff indicated that she has no problem with personal care, does not need reminders, is able to prepare her own meals for 20 minutes at a time, and is able to do laundry, wash dishes, clean, and mow the lawn, although she notes that she performs these latter tasks "with medication." (Tr. at 172-73.) Plaintiff stated that she goes outside "as much as possible" and is able to walk, drive a car, shop in stores once a week for half an hour to forty-five minutes, and handle her own finances. (Tr. at

10

174.) Plaintiff indicated that she is able to do her "sewing and reading everyday" and she is able to do "very good" at it. (Tr. at 175.) She stated that she can walk for one mile before needing to stop and rest for one to two hours. (Tr. at 176.) Plaintiff also indicated that she is able to get along with authority figures, handle stress and changes in routine, follow verbal and written instructions, and pay attention. (Tr. at 176-77.) Plaintiff stated that she uses glasses to read and, although she has a neck brace, she doesn't use it. (Tr. at 177.)

At the administrative hearing, Plaintiff testified that she was living in a "pathway shelter for the homeless" and that she was responsible for doing chores, "but they know I can only do light work, so they know that if I have to take breaks, I can, so they know my situation." (Tr. at 38.) When the ALJ asked whether Plaintiff's neck pain travels, Plaintiff stated:

> Yes, it travels to the point where I get headaches, like migraines, and it travels down both arms where they're so numb that I can't lift anything, I can't grip anything. The headaches get so bad that I see double vision. I get sick. I can't stand, you know, I like literally have to lay down. I get anxiety attacks to the point where I feel like I'm actually having a heart attack that they get so bad.

(Tr. at 39.) Plaintiff also stated that she has "numbness" and "tingling" and that her memory is "short" and she gets "extremely tired" from the medication she takes. (Tr. at 39-40.) When asked why she could no longer work, Plaintiff responded:

> [I]t was getting to the point where I just couldn't – because I was still trying to work, and I couldn't anymore. It was like the more I worked, the more pain pills I was taking, and I knew that was wrong, so I was hurting myself in both ways, you know, by working because I have – I actually have an addiction to work, that when I work, I can't just take it easy, so I would take more pain pills than I should when I would go, and then when I would come home, I would take more in order to, you know, to get the pain to go away to even try to sleep, and I finally just realized that I was killing my insides, and out, and I just knew from that day on that I finally had to admit that I couldn't do it anymore.

(Tr. at 40.) Plaintiff stated that of the six prescription medications she takes, morphine "brings [her] pain] down to a minimum, you know. I mean, it still only takes it down to like a 5, but at least it's

11

not a 10 . . . ." (Tr. at 41.) Plaintiff testified that she is able to take care of her own personal needs and that she has a driver's license, but does not have a car. (*Id.*) Plaintiff stated she "pretty much" sits during the day and that she enjoys sewing for ten minutes or so, but then she needs to get up for a while. (Tr. at 42.) Plaintiff further testified that she lies down periodically throughout the day. (Tr. at 43.) Plaintiff also indicated that she walks to the soup kitchen every day for meals, which is about one block away from the shelter. (*Id.*) She stated that she likes to "read just about anything" and that she watches television. (*Id.*) Plaintiff stated that she can sit for about ten minutes and can stand for about fifteen minutes before needing to change positions; she's most comfortable lying down, although she has to "keep shifting" because "everything goes numb." (Tr. at 45.) Plaintiff indicated that her "whole hand" goes numb and that she can only lift a half-gallon of milk. (Tr. at 46.) Plaintiff further indicated that she has about three good days each week where her headaches aren't as bad; on the bad days, she has to lie down more and put cold compresses on her eyes. (Tr. at 47-48.)

The ALJ asked the vocational expert ("VE") to consider a person with Plaintiff's background who

> could perform work at the light exertional level . . . . No climbing ladders, ropes or scaffolds. Occasionally climbing ramps or stairs, occasional balance, stoop, crouch, kneel and crawl. No constant rotation or flexion or extension of the neck. No overhead reaching or handling, avoid concentrated exposure to excessive vibration, avoiding even – avoiding concentrated use of – I'll say (INAUDIBLE) use of all driving, avoiding concentrated use of moving machinery, avoiding all exposure to unprotected heights, and we're going to – let's see, (INAUDIBLE) those physical exertional limitations right now . . . oh, and also, fingering is going to be limited to no constant fingering.

(Tr. at 52.) The VE responded that such a person could perform the job of data entry clerk if no constant fingering were required, but could not perform the job if the person were only able to do occasional fingering. (Tr. at 53.) For the second hypothetical, the ALJ asked the VE to assume all

12

of the above with the addition of only occasional fingering, decision making, and changes in the work setting. (*Id.*) The VE responded that such a person would be able to perform the 4,000 information clerk, 2,500 lobby attendant, and 1,000 visual inspector jobs available in the Southeastern Michigan region, which includes the City of Detroit and the five surrounding counties. (Tr. at 50, 53.)

For the third hypothetical, the ALJ asked the VE to assume a person with Plaintiff's background who is

> [s]edentary, no climbing ladders, ropes or scaffolds, only occasionally climbing ramps or stairs, balance, stoop, crouch, kneel and crawl. Again, the no constant rotation or flexion or extension of the neck. Again, no overhead reaching or handling, no constant fingering, avoid concentrated exposure to excessive vibration, again avoiding fast moving machinery and driving, avoiding all unprotected heights, again, only occasional decision making, only occasional changes in the work setting – actually, let me change that non-exertional component to just saying let's go to no – the individual is going to be limited to simple, routine and repetitive tasks performed in a work environment free of fast paced production, involving simple work related decisions (INAUDIBLE) changes.

(Tr. at 54.) The VE responded that such a person would be able to perform the 4,000 information clerk, 1,500 security monitor, and 1,500 visual instructor jobs available in the region. (Tr. at 54-55.)

    **F.**    **Analysis and Conclusions**

    **1.**    **Legal Standards**

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of light work. (Tr. at 22-26.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work,

13

> unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

**2.     Substantial Evidence**

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 9.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff contends that the evidence does not support the ALJ's RFC findings, that the hypothetical was therefore inaccurate, and that the ALJ failed to properly assess Plaintiff's credibility. (Doc. 11 at 13-21.)

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379

(6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645 at *3 (6th Cir. Feb. 11, 1999) (unpublished). However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.* Although a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a), 416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or

15

about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence." S.S.R. 96-7p, at *1 (emphasis added). Instead, the ALJ must consider the following factors:

    (i)    [D]aily activities;

    (ii)    The location, duration, frequency, and intensity of . . . pain;

    (iii)    Precipitating and aggravating factors;

    (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)    Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)    Any measures . . . used to relieve . . . pain.

*Felisky*, 35 F.3d at 1039-40; S.S.R. 96-7p, at *3. Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility. 20 C.F.R. § 404.1527(c); S.S.R. 96-7p, at *5.

After examining the record evidence, I conclude that substantial evidence supports the ALJ's credibility finding. The ALJ considered the appropriate factors and found that Plaintiff's complaints of disabling pain were not fully credible. (Tr. at 22-26.) I note that this conclusion is supported by the RFC Assessment which also concluded that Plaintiff was not fully credible. (Tr. at 421.)

I further find that the objective medical evidence fails to support a finding of disabling impairments. Although Plaintiff underwent an anterior cervical fusion, upon discharge, Plaintiff's "preoperative symptoms were resolved and she was discharged home in excellent condition." (Tr. at 268.) By September 23, 2005, Plaintiff was "doing extremely well" and was "symptom-free." (Tr. at 255.) In 2006, physical therapy improved Plaintiff's range of motion, flexibility, strength, function and pain management. (Tr. at 288.) In addition, also in 2006, an MRI showed only

"[m]inimal stable discogenic bulges," but all else was normal. (Tr. at 234.) On November 2, 2006, Dr. Grain determined that Plaintiff could "return to work with full duties 1-1-07, 8 hours per day." (Tr. at 323.) There is no evidence that her condition significantly worsened since that time; therefore, it is not surprising that the ALJ declined to rely on Dr. Grain's later statement, written in 2007, stating that Plaintiff "may only return to work at 4-6 [hours] per day as per my restrictions from previous." (Tr. at 315.)

Plaintiff's condition remained stable through 2007, as evidenced by an MRI of her cervical spine (Tr. at 273) with only "some osteophytes" and "some degeneration" at C4-C5 later that year. (Tr. at 330.) Plaintiff's motor strength for her deltoids, biceps, triceps, wrist extensors, wrist flexors, interossel and grip was five out of five and normal on the right and the left. (Tr. at 240, 327.) In addition, Plaintiff's sensory indications were all normal on her right and left from C5 through T1. (*Id.*) Plaintiff's hip, knee and ankle flexors and entensors all showed full strength (five out of five) on the right and left and her sensory indications were all normal on the right and left from L2 through S1. (Tr. at 241, 328.) By June 15, 2009, Plaintiff's "functional status ha[d] improved" and she had "made good gains in her ROM and [was] progressing her strength." (Tr. at 412-13.)

Furthermore, Plaintiff's credibility was undermined by the fact that her testimony at the administrative hearing regarding the limiting effect of her impairments was vastly different from her statements in her Daily Activity Report. (Tr. at 38-48, 171-77.) In addition, Plaintiff's impairments did not require treatment beyond physical therapy and prescription medications. No further surgery was recommended for her cervical or lumbar spine impairments; likewise, it was not recommended that she undergo any steroid or other medicinal injections. (Tr. at 241-42, 328-29.) Such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc.*

*Sec.*, 405 Fed. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 Fed. App'x 332, 334-35 (6th Cir. 2007). I therefore conclude that the ALJ's credibility findings were supported by substantial evidence.

As to the overall RFC analysis, I conclude that the hypothetical posed to the VE properly incorporated the limitations found in the RFC assessment and was in harmony with the objective record medical evidence as well as Plaintiff's own statements that she is able to take care of her dog and cat, watch television, sew, perform her own personal care, prepare meals, do laundry, wash dishes, clean, mow the lawn, go outside "as much as possible," walk a mile before needing a rest, drive a car, shop in stores, handle her finances, handle stress and changes in routine, follow verbal and written instructions, and pay attention. (Tr. at 171-77.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

### III.   CONCLUSION

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

### IV.   ORDER

In light of the entire record in this case, the Court finds that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS ORDERED**

that Plaintiff's Motion for Summary Judgment (Doc. 11) is **DENIED**, that Defendant's Motion for Summary Judgment (Doc. 15) is **GRANTED**, and that the findings of the Commissioner are **AFFIRMED**.

                                                s/ Charles E Binder  
                                                CHARLES E. BINDER  
Dated: October 18, 2012               United States Magistrate Judge

## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date: October 18, 2012                     By     s/Patricia T. Morris  
                                                      Law Clerk to Magistrate Judge Binder